IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-3

No. 59A21

Filed 11 February 2022

IN THE MATTER OF C.C.G.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1)–(2) from orders entered on 3 April 2020 by Judge Jeanie Houston and on 16 November 2020 by Judge David V. Byrd in District Court, Ashe County. This matter was calendared for argument in the Supreme Court on 22 December 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Grier J. Hurley for petitioner-appellee Ashe County Department of Social Services.*

*Paul W. Freeman Jr. for appellee Guardian ad Litem.*

*Wendy C. Sotolongo, Parent Defender, by Jacky Brammer, Assistant Parent Defender, for respondent-appellant mother.*

BARRINGER, Justice.

Respondent appeals from the trial court's order terminating her parental rights to her daughter C.C.G. (Carrie)[1] and from the trial court's earlier permanency-planning order which eliminated reunification from Carrie's permanent

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

plan. *See* N.C.G.S. § 7B-1001(a1) (2019). Respondent has not challenged on appeal the trial court's conclusions that grounds existed to terminate her parental rights or that termination was in Carrie's best interests. Instead, respondent argues the trial court erred by denying her motion to continue the termination hearing, by failing to comply with the requirements of the Indian Child Welfare Act (ICWA), and by eliminating respondent's visitation with Carrie in a permanency-planning order. After careful review, we find no reversible error.

## I.    Factual and Procedural Background

On 15 March 2019, the Ashe County Department of Social Services (DSS) filed a petition alleging that Carrie was a neglected juvenile. The petition alleged that respondent had a long history with DSS dating back to 2006 due to issues of domestic violence, substance abuse, mental health difficulties, and improper supervision and that DSS recently became involved with the family when it received a report in December 2018 alleging substance abuse, medical neglect, and improper care and supervision.

In an order entered 3 May 2019, the trial court adjudicated Carrie to be a neglected juvenile. The trial court agreed with DSS's recommendation that it was in Carrie's best interests to continue Carrie in respondent's custody with conditions that respondent comply with her Family Service Case Plan and that Carrie attend school regularly and without tardiness.

On 13 May 2019, DSS filed a motion for review due to respondent's noncompliance with both the adjudication order and her Family Service Case Plan. DSS alleged that Carrie continued to have unexcused absences and tardies from school. DSS also alleged that respondent had not complied with her Family Services Case Plan in that she did not attend the scheduled assessment for Carrie at Youth Villages; had not consistently attended her substance abuse sessions at Daymark; had a positive drug screen; and had been arrested for possession of schedule IV substances, schedule II substances, marijuana, and methamphetamine.

Following a review hearing on 15 May 2019, the trial court entered an order on 28 June 2019 granting DSS nonsecure custody of Carrie with placement in DSS's discretion. Respondent was granted a minimum of two hours of supervised visitation twice per month. The trial court concluded that the best primary plan of care for Carrie was reunification with a secondary plan of guardianship with an approved caregiver.

Pursuant to N.C.G.S. § 7B-906.1(a), the trial court conducted regular permanency-planning hearings. After the permanency hearing on 14 February 2020, the trial court concluded that supervised visitation between respondent and Carrie was not in Carrie's best interest and inconsistent with her health and safety. Therefore, the trial court suspended visitation and contact between respondent and

Carrie. Further, the trial court changed the permanent plan to adoption with a secondary plan of custody or guardianship with an approved caregiver.

¶ 7        On 2 June 2020, DSS filed a petition to terminate respondent's parental rights alleging grounds for termination pursuant to N.C.G.S. § 7B-1111(a)(1)–(3), (6). When respondent did not appear at the termination hearing on 16 October 2020, respondent's counsel made an oral motion to continue. The trial court denied the motion to continue. Following the hearing and presentation of evidence, the trial court entered an order concluding that grounds existed to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1)–(3) and that it was in Carrie's best interests that respondent's parental rights be terminated. Accordingly, the trial court terminated respondent's parental rights. Respondent appealed.

## II.    Analysis

### A. Motion to Continue

¶ 8        "[A] denial of a motion to continue is only grounds for a new [termination-of-parental-rights hearing] when [the respondent] shows both that the denial was erroneous, and that he [or she] suffered prejudice as a result of the error." *In re A.L.S.*, 374 N.C. 515, 517 (2020) (quoting *State v. Walls*, 342 N.C. 1, 24–25 (1995)). Unless the motion to continue raises a constitutional issue, "a motion to continue is addressed to the discretion of the trial court." *Id.* at 516–17 (quoting *Walls*, 342 N.C. at 24). Therefore, to show error on a motion to continue that does not raise a

constitutional issue, the respondent must show that the trial court abused its discretion. *Id.* at 517. "Abuse of discretion results where the [trial] court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 517 (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)).

¶ 9        In this matter, respondent has not advanced a constitutional argument before the trial court or this Court. Instead, respondent asserts that the trial court abused its discretion because there was no evidence she received notice of the hearing, a guardian ad litem had been appointed for her, the trial court was deprived of her testimony, and the trial court had previously allowed continuances.

¶ 10        Based on the record before us, respondent has failed to show an abuse of discretion by the trial court. "[C]ontinuances are not favored and the party seeking a continuance has the burden of showing sufficient grounds for it." *In re J.E.*, 377 N.C. 285, 2021-NCSC-47, ¶ 15 (quoting *In re S.M.*, 375 N.C. 673, 680 (2020)). "Continuances that extend beyond 90 days after the initial petition shall be granted only in extraordinary circumstances when necessary for the proper administration of justice." N.C.G.S. § 7B-1109(d) (2021).

¶ 11        In this matter, the record reflects that the notice of hearing was sent to respondent's counsel and respondent's guardian ad litem. Both respondent's counsel and respondent's guardian ad litem were present at the termination-of-parental-

rights hearing. Neither tendered an affidavit or evidence in support of the motion to continue. Instead, they made unsworn statements in support of the motion to continue. Neither argued that respondent intended to testify, that the preexisting appointment of a guardian ad litem entitled respondent to a continuance, or that the previously allowed continuances justified allowance of this continuance. Respondent's counsel and respondent's guardian ad litem instead represented that they believed respondent was aware of the hearing date and had made efforts to contact her but had not spoken to respondent. However, they had corresponded about the hearing date with respondent's mother, who had respondent's contact information and often provided a home for respondent.

After hearing from respondent's counsel and guardian ad litem, the trial court asked DSS's counsel if DSS had spoken to respondent. DSS's counsel replied that the social worker had spoken to her last week. The social worker then informed the trial court that she had spoken with respondent twice the week prior and that respondent "knows when the court date is." The social worker explained that respondent knew that the court date was today as she had spoken to respondent last week about the date and respondent was upset that the hearing was on her birthday.

Given the representations to the trial court and the record before us, we cannot conclude that the trial court's denial of the motion to continue was manifestly unsupported by reason or arbitrary. The burden falls to the party seeking the

continuance to show sufficient grounds for granting the motion. *In re J.E.*, ¶ 15. It does not shift to another party or the trial court. *See id.* Thus, in the context of this case, where among other things the moving party has only offered unsworn statements and argument, we find no error by the trial court. *See State v. Beck*, 346 N.C. 750, 756–57 (1997) (finding trial court did not err by denying motion to continue where unsworn statements of defendant's trial counsel were not sufficient to justify delaying the trial).

¶ 14        Respondent has also failed to show any prejudice arising from the trial court's denial of her motion to continue. Respondent argues she was materially prejudiced because her testimony was a vital source of information regarding the nature of the parent/child relationship and integral to any consideration of her parental rights. However, when making the oral motion, respondent's counsel neither indicated respondent intended to testify nor provided an affidavit or offer of proof of respondent's potential testimony. Thus, as in other cases the Court has decided recently, there is nothing before this Court to show that respondent would have testified and that such testimony would have impacted the outcome of the proceeding. *See, e.g.*, *In re D.J.*, 378 N.C. 565, 2021-NCSC-105, ¶ 14; *In re H.A.J.*, 377 N.C. 43, 2021-NCSC-26, ¶ 13; *In re A.L.S.*, 374 N.C. at 518. Therefore, we hold that the trial court did not err by denying the request for a continuance.

## B. Indian Child Welfare Act

¶ 15      Respondent argues the trial court failed to comply with its duties under the ICWA because the trial court had reason to know that Carrie was an Indian child. DSS and the guardian ad litem for Carrie (GAL) disagree, arguing that respondent conflates the existence of or possibility of a distant relation with an Indian with reason to know that a child is an Indian child.

¶ 16      Paragraph (c) of 25 C.F.R. § 23.107 specifies when a trial court has reason to know a child is an Indian child. It states:

> (c)   A court, upon conducting the inquiry required in paragraph (a) of this section, has reason to know that a child involved in an emergency or child-custody proceeding is an Indian child if:
> (1)   Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;
> (2)   Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;
> (3)   The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;
> (4)   The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;
> (5)   The court is informed that the child is or has been a ward of a Tribal court; or
> (6)   The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe.

25 C.F.R. § 23.107(c) (2020).

¶ 17 "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) *a member of an Indian tribe* or (b) is eligible for membership in an Indian tribe *and* is the biological child of *a member of an Indian tribe*." 25 U.S.C. § 1903(4) (emphasis added). Thus, as we have previously explained,

> "The inquiry into whether a child is an 'Indian child' under ICWA is focused on only two circumstances: (1) Whether the child is a citizen of a Tribe; or (2) whether the child's parent is a citizen of the Tribe and the child is also eligible for citizenship." Indian Child Welfare Act Proceedings; Final Rule, 81 Fed. Reg. at 38,804. The inquiry "is not based on the race of the child, but rather indications that the child and her parent(s) may have a political affiliation with a Tribe [as defined in 25 U.S.C. § 1903]." Indian Child Welfare Act Proceedings; Final Rule, 81 Fed. Reg. at 38,806; *see also* Indian Child Welfare Act Proceedings; Final Rule, 81 Fed. Reg. at 38,801 (" 'Indian child' is defined based on the child's political affiliation with a federally recognized Indian Tribe.").

*In re M.L.B.*, 377 N.C. 335, 2021-NCSC-51, ¶ 16 (alteration in original).

¶ 18 Here, respondent relies on three documents in the record to support her argument that there is reason to know Carrie is an Indian child. First, respondent relies on a DSS court report reflecting an answer of "no" to the inquiry whether there is "any information to indicate that [Carrie] may be subject to the [ICWA]" and explaining, "[respondent] reported there is [a] possible distant Cherokee relation on her mother's side of the family." Second, respondent relies on an in-home family

services agreement stating, "[respondent] reports Cherokee Indian Heritage." Third, respondent relies on another DSS court report reflecting an answer of "no" to the inquiry whether there is "any information to indicate that [Carrie] may be subject to the [ICWA]" and explaining, "[respondent] reported there is [a] possible distant Cherokee relation on her mother's side of the family but no further specifics are known."

¶ 19  None of these documents state Carrie is an "Indian child" and none contain information indicating that Carrie or her biological parents are members or citizens of an Indian tribe.[2] *See* 25 C.F.R. § 23.107(c)(1)–(2). Indian heritage, which is racial, cultural, or hereditary does not indicate Indian tribe membership, which is political. *See* 25 U.S.C. § 1903(4); *In re M.L.B.*, ¶ 16. Thus, these statements do not provide reason to know that Carrie is an Indian child under 25 C.F.R. § 23.107(c).

¶ 20  However, respondent also contends the trial court erred by not asking at the termination-of-parental-rights hearing whether the participants had reason to know if Carrie was an Indian child.

¶ 21  Subsection 23.107(a) of Title 25 of the Code of Federal Regulations provides that "State courts must ask each participant in an emergency or voluntary or

---

[2] At the termination-of-parental-rights hearing, the social worker also testified that there was no information that Carrie is a member of an Indian tribe and that there were no reports from family members that Carrie was possibly an Indian child. Therefore, there was no reason on the basis of the information that was available to the trial court at the time of the termination hearing for the trial court to know that Carrie was an Indian child.

involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child" and that "[such] inquiry is made at the commencement of the proceeding and all responses should be on the record."

¶ 22        Child-custody proceeding is defined as follows:

> *Child-custody proceeding.* (1) "Child-custody proceeding" means and includes any action, other than an emergency proceeding, that may culminate in one of the following outcomes:
>
> (i) *Foster-care placement*, which is any action removing an Indian child from his or her parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;
>
> (ii) *Termination of parental rights*, which is any action resulting in the termination of the parent-child relationship;
>
> (iii) *Preadoptive placement*, which is the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; or
>
> (iv) *Adoptive placement*, which is the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.
>
> (2) *An action that may culminate in one of these four outcomes is considered a separate child-custody proceeding from an action that may culminate in a different one of these four outcomes.* There may be several child-custody proceedings involving any given Indian child. Within each child-custody proceeding, there may be several hearings.

25 C.F.R. § 23.2 (2020) (last emphasis added).

¶ 23        The trial court's orders in the trial court's adjudication and disposition order entered on 3 May 2019 and order transferring custody to DSS entered on 28 June 2019 both specifically state "[t]he [c]ourt inquired of the parties and none of the parties know or have reason to know the child is an Indian child as defined at 25 U.S.C. [§] 1902(4); 25 C.F.R. [§] 23.2." Thus, the record[3] before us reflects that the trial court made the inquiry required by 25 C.F.R. § 23.107(a) at the hearing addressing and ultimately resulting in the removal of Carrie from respondent and rendering respondent without the right to have Carrie returned upon demand. However, the record does not reflect that the trial court made the inquiry required by 25 C.F.R. § 23.107(a) at a hearing after DSS moved for termination of the parent-child relationship. Nevertheless, as the determination of whether there is reason to know that Carrie is an Indian child can be made on the record and as discussed previously there is no reason to know that Carrie is an Indian child, we conclude that there is no reversible error. *See In re A.L.*, 378 N.C. 396, 2021-NCSC-92, ¶ 28 (remanding the case to the trial court because the determination of whether there is reason to know the juvenile is an Indian child could not be made on the record).

---

[3] While respondent disputes the determination by the trial court that there is neither information that Carrie is an "Indian child" or reason to know that Carrie is an "Indian child," respondent does not dispute and does not offer any record support contrary to the trial court's finding that it inquired of the parties whether they had reason to know that Carrie is an "Indian child" at hearings prior to the termination-of-parental-rights hearing.

**C. Visitation**

¶ 24        Respondent asks this Court to reverse the 3 April 2020 permanency-planning order which eliminated reunification from Carrie's permanent plan because the determination to cease visitation was either legal error or abuse of discretion.

¶ 25        In cases arising under the juvenile code, "to obtain relief on appeal, an appellant must not only show error, but that the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action." *In re L.E.W.*, 375 N.C. 124, 128 (2020) (cleaned up). To show error by the trial court concerning visitation in a permanency-planning order which eliminated reunification, we review for an abuse of discretion "with an abuse of discretion having occurred only upon a showing that the trial court's actions are manifestly unsupported by reason." *In re L.E.W.*, 375 N.C. at 134 (cleaned up). We also "review the order eliminating reunification together with an appeal of the order terminating parental rights." N.C.G.S. § 7B-1001(a2).

### 1. *Challenge to reconsideration of visitation plan*

¶ 26        According to respondent, the determination to cease visitation was legal error or abuse of discretion because the trial court at the February 2020 hearing had "substantially the same" information and facts before it that the trial court had at the 22 November 2019 hearing, where it found visitation was still in Carrie's best interests. However, respondent concedes that additional information was in the DSS

court report and that the GAL court report and a social worker provided new testimony. In other words, the trial court received new information at the February 2020 hearing. Pursuant to N.C.G.S. § 7B-906.1(d)(2), at review and permanency-planning hearings, the trial court shall consider "whether there is a need to create, modify, or enforce an appropriate visitation plan in accordance with [N.C.]G.S. [§] 7B-905.1." N.C.G.S. § 7B-906.1(d)(2) (2021). As N.C.G.S. § 7B-906.1(d)(2) instructs the trial court to consider the visitation plan and the trial court received new information, we find no merit in respondent's argument.

### 2. *Challenge to findings of fact 18 and 34*

¶ 27        Respondent also challenges findings of fact 18 and 34, arguing that the social worker's testimony that supports these findings was not reliable. The trial court found in findings of fact 18 and 34 that:

> 18.    [Carrie] had behavioral setbacks until September 2019. Since she has not seen [respondent] and is in the group home [Carrie] has made improvements. Prior to September 2019 [Carrie] had superficial self-harming behaviors and was aggressive with her peers. She has attended a day treatment program as referred through Youth Villages and is in therapy. [Carrie] has asked about [respondent] one time since September 2019.
>
> . . . .
>
> 34.    Supervised visitation with [respondent] at this time is not in [Carrie's] best interest and is not consistent with her health and safety.

¶ 28    We review the trial court's challenged findings of fact in a permanency-planning order that ceases reunification to determine whether they are supported by the evidence received before the trial court. *In re L.M.T.*, 367 N.C. 165, 168 (2013).[4] At a review or permanency-planning hearing, "[t]he [trial] court may consider any evidence, including hearsay evidence as defined in [N.C.]G.S. [§] 8C-1, Rule 801, or testimony or evidence from any person that is not a party, that the [trial] court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C.G.S. § 7B-906.1(c). Appellate courts may not reweigh the underlying evidence presented at Subchapter I of the Juvenile Code hearings. *See, e.g., In re J.A.M.*, 372 N.C. 1, 11 (2019). It is the role of the trial court in these matters to assess the reliability of the testimony and make a credibility determination. *See id.*

¶ 29    DSS and the GAL contend that the two challenged findings of fact are supported by the social worker's unobjected-to testimony. We agree. The social

---

[4] In past cases, we have used the term "competent evidence" when describing the standard of review applicable to the findings of fact in a permanency-planning order. *See, e.g., In re L.M.T.*, 367 N.C. 165, 168 (2013). In some contexts, competent evidence means admissible evidence pursuant to the rules of evidence. *See Evidence, Black's Law Dictionary* (11th ed. 2019). However, N.C.G.S. § 7B-906.1(c) makes clear that the evidence that the trial court receives and considers in a review or permanency-planning hearing need not be admissible under the North Carolina Rules of Evidence. Further, our precedent and Rules of Appellate Procedure dictate when we can review the admissibility of evidence admitted by the trial court. Accordingly, for clarity, we are avoiding the phrase "competent evidence" in the context of permanency-planning orders in favor of using the language the statute itself employs: "evidence."

worker testified at the hearing that respondent's last visit with Carrie was 6 September 2019, that Carrie had some substantial behavior setbacks "up until about September," including self-harming and aggressive behaviors with some of her peers, and that "she just really turned it around," including improving her grade in math, ceasing talking like a baby, and being more compliant. The social worker testified that Youth Villages recommended day treatment, which was not available at her current placement. Thus, DSS transferred Carrie to a new placement in August with what they described as "an amazing program." The social worker further testified that she believed there was a correlation between Carrie's improvement in behavior and her not having seen respondent since September. The social worker explained that Carrie wanted to be adopted and asked about respondent only once since September. The social worker testified that she thinks it would be detrimental to have respondent visiting and contacting Carrie. Since the foregoing testimony from the social worker supports findings of fact 18 and 34, they are conclusive on appeal. We, therefore, reject respondent's challenge to findings of fact 18 and 34.

### 3. *Challenge to cessation of visitation*

¶ 30        We next address respondent's challenge to the trial court's determination to cease visitation. Visitation shall be provided "that is in the best interests of the juvenile consistent with the juvenile's health and safety, including no visitation." N.C.G.S. § 7B-905.1(a) (2021). In this matter, we are bound to challenged findings of

fact 18 and 34, which are supported by the evidence before the trial court, and the unchallenged findings of fact from the 3 April 2020 permanency-planning order and the termination-of-parental-rights order.

Pursuant to the binding findings, "[u]pon entering foster care, [Carrie] exhibited behaviors such as walking on her tippy toes, talking in a baby voice, being noncompliant and throwing tantrums as well as self-harming behaviors." Carrie received medical evaluations and was diagnosed with post-traumatic stress disorder. Carrie was a teenager at the time. "During the period of time [Carrie] did not have contact with her [respondent,] these behaviors would improve." "When visits or contact with [respondent] occurred, [Carrie's] behaviors would regress." Carrie desired to be adopted and did not see her mother as part of her future.

Respondent only attended six visits with Carrie, and she "appeared at a visit impaired, fell asleep at a visit, made false promises to [Carrie,] and told [Carrie] to not comply with Ashe County DSS." Respondent's calls with Carrie were at times not appropriate and sometimes involved intensely questioning Carrie, making irrational comments, or giving Carrie false hope. Respondent continued to have positive drug screens, refused some drug screenings, did not attend a referred parenting class, and never completed her psychological evaluation. Respondent also absconded from the facility at which she was required to undergo treatment as a condition of her probation and refused to meet with the social worker in January 2020. Given the

foregoing findings of fact, we are unable to say that the trial court abused its discretion by ceasing visitation with Carrie.

### *4. Challenge to finding of reasonable efforts by DSS*

¶ 33        In the alternative, respondent argues that DSS failed to provide reasonable efforts to implement the child's permanent plan by not providing respondent with any visits with Carrie between late September 2019 and February 2020. Respondent contends that "because visitation is an essential part of reunification, there can be no reasonable efforts toward reunification or preventing foster care when DSS is not providing visitation with the child's mother, even though it is still in the child's best interests." We disagree.

¶ 34        Subsections 7B-906.1(e)(5) and 7B-906.2(c) direct the trial courts to consider and make written findings of fact regarding whether the county department of social services has exercised reasonable efforts since the initial permanency plan hearing to implement the permanent plan for the juvenile. The juvenile code defines "reasonable efforts" as

> The diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time. If a court of competent jurisdiction determines that the juvenile is not to be returned home, then reasonable efforts means the diligent and timely use of permanency planning services by a department of social services to develop and implement a permanent plan for the juvenile.

N.C.G.S. § 7B-101(18) (2021).

Respondent thus challenges the trial court's determination "[t]hat Ashe County DSS has made reasonable efforts to finalize the permanent plan to timely achieve permanence for the juvenile and eliminate placement in foster care, reunify this family, and implement a permanent plan for the child."[5] The trial court's other findings and the DSS report incorporated by reference into its order support this determination. The trial court found that reunification efforts were made to finalize permanency, including contacting respondent, attempting to contact respondent, maintaining contact with Carrie and the placement providers, and facilitating an updated psychological evaluation for Carrie. The social worker also went to meet respondent in jail in January 2020 to discuss her family service agreement. Respondent, however, refused to meet with her. The DSS report further shows that, among other things, DSS had coordinated supervised visits between respondent and Carrie prior to late September 2019, scheduled a supervised visitation in late September that respondent cancelled, offered to provide respondent transportation assistance that respondent rejected, held Child and Family Team Meetings, and made multiple attempts to meet with and contact respondent, through phone calls

---

[5] Respondent also challenges the trial court's finding that respondent "has not provided emotional support for [Carrie]" and "[v]isitation and contact is detrimental to [Carrie]." This finding is supported by the testimony of the social worker as previously summarized.

and home and jail visits. Collectively, these findings show that DSS was diligently using and providing preventive or reunification services. N.C.G.S. § 7B-101(18). Therefore, respondent's argument is overruled.

Having considered respondent's arguments, we conclude that respondent has not shown any error by the trial court in ceasing respondent's visitation. Respondent also has not shown that even if an error occurred, such error was material and prejudicial. *See In re L.E.W.*, 375 N.C. at 128. Accordingly, we affirm the 3 April 2020 permanency-planning order eliminating reunification from the permanent plan.

### III.     Conclusion

For the reasons set forth above, we affirm the 3 April 2020 permanency-planning order eliminating reunification as a permanent plan and the 16 November 2020 termination-of-parental-rights order.

AFFIRMED.